FILED

2022 Apr-01  PM 02:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JAMES EARL TURNAGE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:18-CV-02127-CLS** |
| | ) | |
| **CHRISTINE   WORMUTH,** | ) | |
| **Secretary, U. S. Department of the** | ) | |
| **Army,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, James Earl Turnage, is a civilian employee of the United States Army on Redstone Arsenal.[1]  He began his employment with the Army's Research, Development, and Engineering Command during 1987 as a "production engineer,"[2] and has worked in several programs since then.[3]  He filed a *pro se* complaint against the Secretary of the Army for alleged violations of Title VII of the Civil Rights Act

---

[1] Redstone Arsenal encompasses 38,400 acres in the southwestern quarter of Madison County, Alabama.  It is bordered on the East, North, and West by the City of Huntsville, and on the South by the Tennessee River.

[2] Doc. no. 65-9 (Plaintiff's Resume), at ECF 1.  "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing").  Bluebook Rule 7.1.4 allows citation to page numbers generated by the ECF header. *The Bluebook: A Uniform System of Citation*, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010).  Even so, the Bluebook recommends against citation to ECF pagination in lieu of original pagination.  Consequently, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

[3] Doc. no. 65-1 (Plaintiff's Deposition), at 13.

of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), claiming that he: had been subjected to a racially-hostile work environment because of his race, African-American;[4] had not been selected for positions in 2007, 2008, 2013, and 2014 because of his race;[5] and, retaliated against for opposing such discrimination.[6] He also alleged race-based defects in the Army's administrative procedures.[7]

This court previously dismissed all but one of the plaintiff's claims when ruling upon defendant's motion to dismiss:[8] *i.e.*, plaintiff's claim that he had been subjected to a racially-hostile work environment;[9] and, the disparate treatment claims based upon plaintiff's failure to be selected for positions in 2007, 2008, and 2013.[10] In addition, plaintiff's retaliation claim and his challenge to the Army's administrative procedures were dismissed as having been abandoned, due to his failure to address defendant's arguments.[11] Thus, the only claim that remains is plaintiff's contention

[4] *See* doc. no. 1 (Complaint), and doc. no. 1-1 (Attachments to Complaint), at ECF 4 (Count 1), and ECF 5 (Count 3).

[5] Doc. no. 1-1 (Attachments to Complaint), at ECF 2.

[6] *Id*. at ECF 5-6 (Count 4).

[7] *Id*. at ECF 4 (Count 1).

[8] Doc. no. 11 (Defendant's Motion to Dismiss).

[9] *See* doc. no. 15 (Memorandum Opinion), at 10 (dismissed for failure to state a claim on which relief could be granted).

[10] *Id*. at 10-11 (dismissed for failure to exhaust administrative remedies).

[11] *Id*. at 9.  Plaintiff filed an amended complaint on April 6, 2020, in which he asserted an additional claim of "disparate impact discrimination through the climate of reorganization."  Doc. no. 30 (First Amended Complaint), at 1.  Defendant filed a motion to dismiss the claim.  Doc. no. 41.  This court found that the claim did not relate to plaintiff's original claims, and that plaintiff also had failed to exhaust the administrative remedies related to the newly asserted claim.  The claim,

that he was not selected in 2014 for the position of "Platform Branch Supervisor" in the Production Engineering Division of the Army's Engineering Directorate because of his race.  The following opinion evaluates that claim in response to defendant's motion for summary judgment.

## I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an

---

accordingly, was dismissed.  Doc. no. 46 (Memorandum Opinion), at 6.

inference is not based on the evidence, but is pure conjecture and speculation."

*Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983)

(alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material* to an issue affecting the
> outcome of the case.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration

supplied).

## II. FACTS

Applications for permanent reassignment as a "Supervisory General Engineer,

DB-801-04" in the Production Engineering Division of the Army's Engineering

Directorate were solicited on January 28, 2014.  As explained in the following email

advertisement transmitted to employees of the Army's Aviation and Missile Research

Development and Engineering Command ("AMRDEC") on that date, the duties and

responsibilities of the position were significant, and included serving as Supervisor

of the Platform Branch in the Production Engineering Division, with responsibility

for leading and mentoring a team of approximately eighteen engineers in providing

production engineering support to the Army's aviation acquisition programs:

1.      There is a permanent requirement to fill a Supervisory General Engineer position (DB-0801-04) in the Production Engineering Division, Engineering Directorate. This position will be filled via lateral reassignment. Only permanent DB-04's or equivalent can be considered for this reassignment.

2.      In order to give fair and equal consideration to all qualified employees, request you submit a written resume by email if you are interested in being considered for this position by COB ["close of business"] 6 Feb 2014.    The resume should include your last performance appraisal rating, and Army Acquisition Corps and Acquisition workforce certification information.   Resumes should be sent to [email address of Human Resources office].

*Position duties and responsibilities include serving as Supervisor, Platform Branch, Production Engineering Division, responsible for leading and mentoring a team of approximately 18 engineers in providing production engineering support to Aviation acquisition programs. The supervisor will be responsible for ensuring appropriate levels of customer support, technical direction, team-level financial management, strategic planning, and personnel leadership/management actions are accomplished. An in-depth knowledge and experience in production engineering and planning, manufacturing readiness, risk management, dealing with prime contractors and suppliers, acquisition procedures and strategies, personnel management techniques, financial management and strategic planning is required.* Supervisory experience is not mandatory, but will be a factor in selecting a candidate for this position.

Doc. no. 65-2 (Jan. 28, 2014 Email Solicitation) (alterations and emphasis supplied).

Plaintiff submitted a timely application for the position.

Michael Lawrence, Chief of the Production Engineering Division, was the

initial selection official in the chain of command.[12]  He created the criteria utilized to evaluate the relative merits of each applicant.  The process consisted of an evaluation of each applicant's resume, followed by interviews of those individuals who scored the highest grades on the resume review.[13]

Lawrence used the following criteria (and corresponding values) when evaluating each applicant's resume:  *Leadership* (0 to 10 points); *Supervisory Experience* (0 to 5 points); *Communication Skills* (0 to 10 points); *Production Engineering Experience* (0 to 10 points); *Acquisition Experience* (0 to 10 points); *Education – M.S. or Ph.D.* (up to 3 points); and *Production and Quality Management* (PQM) or *Engineering* (ENG) *Level III Certification* (0 to 2 points).[14]  If an applicant received the maximum number of points for each evaluation category, the aggregate would total 50.[15]

Fourteen individuals applied for the position by submitting resumes for evaluation.[16]  Following review of each resume, Lawrence selected six applicants for interview:  *i.e.*, Wayne Pierce; Zach Best; Fred Maddox; plaintiff, James Earl

---

[12] *See* doc. No. 65-4 (Transcript of Nov. 7, 2014 Fact-Finding Conference), at 86, 91 (Testimony of Michael Carl Lawrence).

[13] *Id*. at 90.

[14] *Id.* at 93.

[15] Doc. no. 65-6 (Selection Matrix).

[16] *Id.*  One other applicant (Barry Birdsong) was deemed to be "Not eligible," presumably because he was not an AMRDEC employee. *Id.*

Turnage; Lorilee Crisp; and, Rick Szcepanski.[17]

In preparation for the interviews, Lawrence crafted the following prompts, and assigned the referenced point values to each:

1.    Describe your first-hand experience maturing a program from development to production and how the results played out in the context of the defense acquisition process?  (0 to 10 points)

2.    What is your most significant technical achievement, individually or as a team, and what was the outcome? (0 to 10 points)

3.    In the last 10 years (approximately), we have witnessed an entire "business cycle" of Defense Acquisition — build up, execution, and now drawdown from two major conflicts.  As a wholly customer reimbursable organization, what strategies would you pursue during the next cycle to best support customers?  (0 to 10 points)

4.    Describe your customer interface skills and how they would allow you to excel in this position? (0 to 5 points)

5.    Collaboration can improve the productivity and outcomes for an organization.  Provide an example of how you have provided leadership in this type of environment, and what was the outcome?  (0 to 10 points)

6.    What do you look for in employees, and what specific steps would you take to attract high-performers to this organization? (0 to 5 points)

Doc. no. 65-7 (DB-801-IV Supervisory Engineer Interview Questions).  Again, if the maximum number of points were awarded for an applicant's response to each prompt, the aggregate would total 50.

Lawrence described the manner in which he conducted the interview portion

---

[17] *Id.*

of the selection process as follows:

> I would, either my assistant or I would personally notify the individuals and schedule an interview time. The individuals would come in, we would have — I told them that we had 45 minutes to do the interview, but because it was a supervisory job, it wasn't going to be a hard time cut off, that if we needed a few extra minutes, that would certainly be fine, but that if we ran significantly over 45 minutes, I would give them time and understand that they were running a little bit behind.

> So, it was a time to interview, but not with a hard, hard cut-off. To begin the interview, I would always ask them if they had any questions about the job responsibilities. Most of the people understood the responsibilities very well and that would usually go very quickly.

> * * * *

> After we got through asking any questions to make sure that they understood the position and where it fell within the organization, then I would offer them, I would provide them a written set of questions. And, I would give them a few minutes to look at the questions to familiarize themselves and just kind of gather their thoughts. And, then I would allow them to begin to answer the questions and anytime they got ready to, they could take them in any order.

> I would then take notes based on their responses to the questions. There were times that if I wanted to get some clarification of what they meant or asked them to provide some additional details in an area that I might not understand as to what they were, the projects that they were working, or the results they achieved, I would ask some follow-on questions.

> And, that was fairly consistent across the applicants. Usually, I jump in, maybe, two or three or four times during an interview to ask some clarifying questions.

Doc. no. 65-4 (Transcript of Nov. 7, 2014 Fact-Finding Conference), at 108-09.

Lawrence took handwritten notes during each interview, in an attempt "to keep up with where [he] thought [the applicant] was making good points to respond to the question, maybe places where [he] thought [the applicant] could have provided additional detail, or whether there were technical things that [the applicant] probably should have mentioned and may have failed to mention."[18]

After tallying each applicant's scores for his or her response to the interview prompts, Lawrence combined that total with the applicant's score on the resume evaluation to achieve a final, aggregate score.[19]  At the conclusion of that process, Lawrence assigned plaintiff an aggregate score of 70, which included 34 points for review of his resume, and 36 points for his interview responses.[20]

Lawrence ultimately awarded the position to a white male applicant named Wayne Pierce, who received an overall score of 83: *i.e.*, 39 points for evaluation of his resume plus 44 points for his interview responses.[21]  Two other applicants, Zach Best and Fred Maddox, both white males, received higher overall scores than plaintiff.  Best scored 36 on review of his resume and 41.5 points for his interview

---

[18] Doc. no. 65-4 (Transcript of Nov. 7, 2014 Fact-Finding Conference), at 112-13 (alterations supplied).

[19] *Id*. at 115-16.

[20] Doc. no. 65-6 (Selection Matrix).

[21] *Id.*

responses, for a total of 77.5 points; whereas, Maddox scored 35 points on review of his resume and 38 points for his interview responses, for a total of 73 points.[22]

Lawrence submitted the selection materials, along with his selection recommendation, to the supervisor immediately above him in the chain of command: Daniel Stephen Beck, Supervisory General Engineer, Associate Director, Production and Sustainment.[23] Beck approved Lawrence's recommendation to award the position to Wayne Pierce, and the selection materials were then forwarded to the supervisor immediately above him in the chain of command:  Stan Sherrod, Deputy Director of the Engineering Directorate.  Sherrod concurred with the selection criteria employed, and also with Lawrence's recommendation to award the position to Wayne Pierce.[24] The selection ultimately was approved by James Lackey who, at the time, was Acting Director of the Engineering Directorate.[25]

An employee who is not selected for a position may ask the selecting official for a "debrief":  *i.e.*, a discussion of the reasons for the applicant's failure to be selected, so that the employee "can fully understand why [he or she was] not selected, [and] where [he or she] came up short so that . . . the next time [that employee can]

---

[22] *Id.*

[23] Doc. no. 65-4 (Transcript of Nov. 7, 2014 Fact-Finding Conference), at 88; *see also* doc. no. 65-5 (Declaration of Daniel Stephen Beck).

[24] Doc. no. 65-4 (Transcript of Nov. 7, 2014 Fact-Finding Conference), at 148.

[25] *Id.* at 87-88, 148.

be a better candidate."[26]  Plaintiff requested a debrief from Lawrence,[27] but did not find his explanation satisfactory.[28]  Consequently, plaintiff contacted the Equal Employment Opportunity Office and filed a formal complaint.  The Army conducted a fact-finding conference and attempted mediation.[29]  Plaintiff was not satisfied with the results, however, and requested a hearing before an EEO Administrative Judge.[30]  The Judge's decision in favor of the Army was affirmed on administrative appeal.[31]  This suit followed.

## III.  THE STANDARDS FOR DETERMINING DISCRIMINATORY INTENT

The ultimate question in every employment discrimination case is *not* whether a contested employment action was good or bad, fair or unfair, or even whether the plaintiff has established a *prima facie* case, or proved "pretext" (*i.e.*, demonstrated that the employer's stated, allegedly nondiscriminatory reasons for the action are not

---

[26] Doc. no. 65-1 (Plaintiff's Deposition), at 111 (alterations supplied).  Plaintiff refers to this process as a "debrief" or sometimes an "outbrief."  *See id.* at 106-07.

[27] *Id.* at 111.

[28] *Id.* at 106-07.  Plaintiff said that Lawrence did not offer suggestions for plaintiff to make himself a better candidate, because plaintiff "already was better."  *Id.*

[29] Doc. no. 1-1, at ECF 3, 5, 52-53(Formal Complaint of Discrimination); doc. no. 65-4 (Transcript of Nov. 7, 2014 Fact-Finding Conference).

[30] Doc. no. 1-1, at ECF 3, 5.  This court's record contains no information regarding the timing of the hearing, except that the Administrative Judge held a scheduling conference on May 27, 2015. *Id.* at ECF 5.

[31] *Id.* at ECF 3, 5.  The record does not specify the respective dates of the Administrative Judge's decision or the decision on administrative appeal.

worthy of belief).  Instead, the pivotal issue historically has been whether a plaintiff has submitted evidence indicating that "the defendant intentionally discriminated against" him or her on the basis of criteria prohibited by Congress:  *e.g.*, race, color, religion, sex, national origin, age, or disability.  *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

In that regard, "direct evidence" of an employer's discriminatory animus usually is difficult to acquire or not available at all.  *See Sheridan v. E.I. DuPont de Nemors & Co.*, 100 F.3d 1061, 1071 (3d Cir. 1996) (*en banc*).  In part, that is because the legal concepts of "intent" and "intentional acts" refer to subjective, mental attitudes:  *e.g.*, the purpose, plan, or design motivating a person to do, or not do, some act.  Being a state of mind, "intent" rarely is susceptible of direct proof.  More often than not, a person's intent must be inferred from evidence of other facts.  As the Supreme Court has observed, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes."  *Aikens*, 460 U.S. at 716; *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997) (Carnes, J., plurality opinion) ("Frequently, acts of discrimination may be hidden or subtle; an employer who intentionally discriminates is unlikely to leave a written record of his illegal motive, and may not tell anyone about it.").

It is for such reasons that Title VII plaintiffs historically have been compelled to build employment discrimination claims on a foundation of circumstantial evidence. Federal courts normally evaluate the sufficiency of such evidence to demonstrate an employer's intention to discriminate using some variant of the analytical framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). As shall be seen, however, recent decisions of the Supreme Court and Eleventh Circuit have caused a shift away from that familiar framework in Title VII claims filed against federal governmental employers. *See, e.g., Babb v. Wilkie*, 140 S. Ct. 1168 (2020), and *Babb v. Secretary, Department of Veterans Affairs*, 992 F.3d 1193 (11th Cir. 2021).

Title VII of the Civil Rights Act of 1964 made it an unlawful employment practice for a *private, non-governmental employer* "to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[32]   The adjectives "private, non-governmental" in the preceding

---

[32] The full text of this subsection provides that: "It shall be an unlawful employment practice for an employer — (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . ." 42 U.S.C. § 2000e-2(a)(1). By including such language, Congress sought to require "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously

sentence were italicized in order to emphasize that, when the Civil Rights Act of 1964 was enacted, federal departments and agencies were explicitly excluded from Title VII's definition of the term "employer": *i.e.*, "The term 'employer' . . . does not include (1) the United States."[33]   Indeed, it was not until March 24, 1972, when Congress enacted the Equal Employment Act of 1972,[34] that Title VII's coverage was expanded to cover employees of federal military departments and executive agencies. *See* 42 U.S.C. § 2000e-16(a).[35]

---

to discriminate on the basis of racial or other impermissible classification."  *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971).

[33] 42 U.S.C. § 2000e(b) defined "employer" as follows:

> The term "*employer*" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, *but such term does not include* (1) *the United States*, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.  [Emphasis supplied.]

[34] Pub. L. 92-261, 86 Stat. 103 (1972).

[35] 42 U.S.C. § 2000e-16(a) reads as follows:

> All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) *in military departments* as defined in section 102 of Title 5, *in executive agencies* as defined in section 105 of Title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Regulatory Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in those units of the judicial branch of the Federal Government having positions in the competitive

A.     **Differences in the Statutory Definitions of Unlawful Practices by Private and Governmental Employers**

Even so, there are differences between the statutory definition of the employment actions declared to be illegal if performed by private, non-governmental employers — *i.e.*, discriminating "against any individual . . . because of such individual's race, color, religion, sex, or national origin"[36] — and the prohibition applicable to federal governmental employers: *i.e.*, "All personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."[37]

Despite that difference in language, many courts interpreted the Equal Employment Act of 1972 as placing the same restrictions on federal governmental

---

service, in the Smithsonian Institution, and in the Government Publishing Office, the Government Accountability Office, and the Library of Congress *shall be made free from any discrimination based on race, color, religion, sex, or national origin.* [Emphasis supplied.]

[36] 42 U.S.C. § 2000e-2(a) provides that:

(a)  It shall be an unlawful employment practice for an employer—

        (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

        (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

[37] 42 U.S.C. § 2000e-16(a).  See note 35, *supra*, for the full text of that statute.

agencies as the Civil Rights Act of 1964 had imposed upon private employers.  *See, e.g.*, *Barnes v. Costle*, 561 F.2d 983, 988 (D.C. Cir. 1977) ("Congress legislated for federal employees essentially the same guarantees against sex discrimination that previously it had afforded private employees")).

Consequently, many courts construed the provision pertaining to federal agencies in the light of those cases addressing the employment practices of private employers.  *See, e.g.*, *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.14 (1977) (observing that, when enacting the 1972 amendments to Title VII, "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike") (citations omitted); *Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981) (observing that, as a result of the Circuit's previous opinion in *Barnes v. Costle*, *supra*, holding that the Equal Employment Act of 1972 placed the same restrictions on federal agencies as Title VII had done upon private employers, "we may construe the latter provision in terms of the former").

Accordingly, courts began to apply the familiar *McDonnell Douglas* framework, formulated for use in Title VII actions against private, non-governmental employers, to federal employers.  *See, e.g., Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999); *Holbrook v. Reno*, 196 F.3d 255, 259 (D.C. Cir. 1999); *Parker v. Secretary, U.S. Department of Housing & Urban Development*, 891 F.2d 316, 320

(D.C. Cir. 1989); *Mitchell v. Baldrige*, 759 F.2d 80, 84 (D.C. Cir. 1985); *McKenna v. Weinberger*, 729 F.2d 783, 788 (D.C. Cir. 1984); *Valentino v. United States Postal Service*, 674 F.2d 56, 63 (D.C. Cir. 1982).[38]

## B.    The *Babb* Shift

That frame of reference began to shift in 2020, however, when the Supreme Court decided *Babb v. Wilkie*, 140 S. Ct. 1168 (2020) ("*Babb I* ").  That opinion addressed the question of whether 29 U.S.C. § 633a(a) — the federal-sector provision of the Age Discrimination in Employment Act of 1967 ("ADEA")[39] — imposed liability only when a plaintiff demonstrated that his or her age was a "but-for cause" of the personnel action in question.  *Babb I*, 140 S. Ct. at 1171.[40]  The Supreme Court

_____

[38] The Supreme Court also assumed, without explicitly holding, the test applied to a federal governmental employer.  *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711 (1983).

[39] The full text of 29 U.S.C. § 633a(a) reads as follows:

> *All personnel actions affecting employees or applicants for employment who are at least 40 years of age* (except personnel actions with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of Title 5, in executive agencies as defined in section 105 of Title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Regulatory Commission, in those units in the government of the District of Columbia having positions in the competitive service, and in those units of the judicial branch of the Federal Government having positions in the competitive service, in the Smithsonian Institution, and in the Government Publishing Office, the Government Accountability Office, and the Library of Congress *shall be made free from any discrimination based on age.*  [Emphasis supplied.]

[40] The "but-for" standard requires a plaintiff to show "'that the harm would not have occurred' in the absence of — that is, but for — the defendant's conduct." *University of Texas Southwest Medical Center v. Nassar*, 570 U.S. 338, 346–47 (2013) (quoting RESTATEMENT (FIRST)

held that

> § 633a(a) goes further than that.  The plain meaning of the critical statutory language ("made free from any discrimination based on age") demands that personnel actions be *untainted by any consideration of age*.  This does not mean that a plaintiff may obtain all forms of relief that are generally available for a violation of § 633a(a), including hiring, reinstatement, backpay, and compensatory damages, without showing that a personnel action would have been different if age had not been taken into account.  To obtain such relief, a plaintiff must show that age was a but-for cause of the challenged employment decision.  *But if age discrimination played a lesser part in the decision, other remedies may be appropriate*.

*Id*. (emphasis supplied).  Following a thorough exegesis of the text of the statute, the

Supreme Court concluded:  "If age discrimination plays *any part in the way a decision is made*, then the decision is not made in a way that is untainted by such discrimination."  *Id.* at 1174 (emphasis supplied).  The Court offered a "simple example" of how such an interpretation might play out:

> Suppose that a decision-maker is trying to decide whether to promote employee A, who is 35 years old, or employee B, who is 55.  Under the employer's policy, candidates for promotion are first given numerical scores based on non-discriminatory factors.  Candidates over the age of 40 are then docked five points, and the employee with the highest score is promoted.  Based on the non-discriminatory factors, employee A (the 35-year-old) is given a score of 90, and employee B (the 55-year-old) gets a score of 85.  But employee B is then docked 5 points because of age and thus ends up with a final score of 80.  The decision-maker looks at the candidates' final scores and, seeing that employee A has the higher score, promotes employee A.

---

OF TORTS § 431 comment a, and § 432(1) comment a (American Law Institute 1934)).

> The decision is not "made" "free from any discrimination" because employee B was treated differently (and less favorably) than employee A (because she was docked five points and A was not). And this discrimination was "based on age" because the five points would not have been taken away were it not for employee B's age.
>
> It is true that this difference in treatment did not affect the outcome, and therefore age was not a but-for cause of the decision to promote employee A. Employee A would have won out even if age had not been considered and employee B had not lost five points, since A's score of 90 was higher than B's initial legitimate score of 85. But under the language of § 633a(a), this does not preclude liability.

*Id*. at 1174. Under the Court's analysis, "employee B" would not be able to recover certain forms of relief, including backpay and compensatory damages, but could "seek injunctive or other forward-looking relief." *Id.* at 1178. The Supreme Court remanded the case for further proceedings, which ultimately resulted in the Eleventh Circuit's decision in *Babb v. Secretary, Department of Veterans Affairs*, 992 F.3d 1193 (11th Cir. 2021) ("*Babb II* "). The Eleventh Circuit's opinion extended the Supreme Court's holding in *Babb I* to claims brought under Title VII. *Id.* at 1205.

The Circuit reasoned that the text of Title VII's federal-sector provision is nearly identical to that of the ADEA;[41] and, accordingly, the Supreme Court's analysis in *Babb I* applied equally to discrimination claims brought under that Title VII provision. *Id.* The Eleventh Circuit rejected the Secretary's argument that

---

[41] *Compare* note 36, *supra* (text of 42 U.S.C. § 2000e-2(a)) *with* note 39, *supra* (text of 29 U.S.C. § 633a(a)).

application of the *McDonnell Douglas* framework precluded the plaintiff's Title VII claim, observing that, under *Babb I*, the *McDonnell Douglas* test no longer applied to discrimination claims brought under the federal-sector provision of the ADEA. *Id.* at 1204. Hence, the same result should obtain when considering discrimination claims brought under Title VII's federal-sector provision. Ultimately, the Circuit remanded the case to the district court for reconsideration in the light of *Babb I*. *Id.* at 1208.

Since deciding *Babb II*, the Eleventh Circuit has, on several occasions, reaffirmed that the *McDonnell Douglas* test no longer applies to Title VII discrimination claims against federal employers. *See, e.g.*, *Durr v. Secretary, Department of Veterans Affairs*, 843 F. App'x 246, 247 (11th Cir. 2021) (*per curiam*) (explaining that neither the "convincing mosaic of circumstantial evidence" test[42] nor the *McDonnell Douglas* framework applies to federal-sector Title VII claims after *Babb I* and *II*); *Malone v. United States Attorney General*, 858 F. App'x 296 (11th Cir. 2021) (*per curiam*) (explaining that, after *Babb I* and *II*, a plaintiff need only show that discrimination was a factor in the challenged employment action to state

---

[42] The "convincing mosaic of circumstantial evidence" test provides an alternative method for establishing a cognizable claim of intentional discrimination in the absence of direct evidence of discrimination. *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220 n.6 (11th Cir. 2019) (*en banc*).

a cognizable claim under the federal-sector provision of Title VII).[43]

Accordingly, plaintiff's remaining claim is governed by the rationale of the *Babb* decisions, and this court must determine whether he presented evidence that his race played any part in the decision to not offer him the position of Platform Branch Supervisor in the Production Engineering Division of the Army's Engineering Directorate on Redstone Arsenal.

## V.  ANALYSIS

Plaintiff submitted five categories of evidence in opposition to defendant's motion for summary judgment:   (1) defendant's responses to plaintiff's interrogatories; (2) plaintiff's "rebuttal testimony" to the declaration of Daniel S. Beck, Supervisory General Engineer, Associate Director, Production and Sustainment; (3) declarations of co-workers Thomas W. Hart, Jr., and Orlando F. Gordon; (4) the testimony of Michael Lawrence during the November 7, 2014 Fact-Finding Conference; and (5) "Production Engineering Division Organization Chart 2003."[44]

First, plaintiff argues that defendant's failure to substantively respond to

---

[43] The Court notes that the Eleventh Circuit's decision in *Troupe v. DeJoy*, 861 F. App'x 291 (11th Cir. 2021) (*per curiam*), appears to apply the *McDonnell Douglas* test to a post-*Babb II* age discrimination claim brought under the federal-sector provision of Title VII, but that opinion is neither binding nor persuasive authority.

[44] Doc. no. 68 (Plaintiff's Motion to Oppose the Motion for Summary Judgment), Attachments 1 through 5.

plaintiff's interrogatories shows "[a]voidance by the Defendant to address [the] impact of race in this case.  All historical data and current statistics about race in the workplace of the Plaintiff are not obtainable.  Cannot be redacted or sanitized."[45] Plaintiff's argument fails, because defendant properly objected to plaintiff's interrogatories under Federal Rule of Civil Procedure 33(b)(4),[46] and those objections do not support plaintiff's claim of race discrimination.

Second, plaintiff's "rebuttal testimony" to Beck's declaration consists solely of conclusory allegations that cannot support his claim.[47]  *See, e.g.*, *Hawthorne v. Sears Termite & Pest Control, Inc.*, 309 F. Supp. 2d 1318, 1332 (M.D. Ala. 2003) (observing that a plaintiff's "*subjective interpretation* of . . . events is not a justifiable one; rather, it can only be seen as an assertion based on a hunch unsupported by significant probative evidence;" and, as such, it cannot defeat a defendant's motion for summary judgment) (emphasis and ellipsis supplied) (citing *Raney v. Vinson Guard Services, Inc.*, 120 F.3d 1192, 1198 (11th Cir. 1997) (holding that a plaintiff's assertions, based upon no more than unsupported hunches, were not sufficient to defeat defendant's motion for summary judgment), and *Blount v. Alabama*

---

[45] *Id.*, Attachment 1, at ECF 4.

[46] Federal Rule of Civil Procedure 33(b)(4) provides in relevant part that "[t]he grounds for objecting to an interrogatory must be stated with specificity."  Defendant satisfied its obligation under this rule.

[47] Doc. no. 68 (Plaintiff's Motion to Oppose the Motion for Summary Judgment), Attachment 2, at ECF 14-18.

*Cooperative Extension Service*, 869 F. Supp. 1543, 1553 (M.D. Ala. 1994) (a plaintiff's allegations, opinions, and conclusory statements are not sufficient to show an intent to discriminate)).

Plaintiff's main contention appears to be his belief that Beck should not have authorized Lawrence to select the Platform Branch Supervisor without the use of a panel of interviewers.[48]   He cites his complaint to Beck about Lawrence in April of 2013, entitled "A Compelling Case Against My Senior Rater:  An Expose of A Hostile Work Environment," arguing that Beck knew that Lawrence would be unfair to plaintiff because of that complaint.  That amounts to nothing more than a "hunch," and it is not sufficient to support plaintiff's claim of race discrimination.

Third, the declarations of plaintiff's co-workers do not support his claim of race-based discrimination.  Thomas Wayne Hart, Jr., described his organizational relationship to plaintiff as a "peer" and "fellow Team Leader."[49]   Hart was asked: "Do you have any reason to believe that Complainant was subjected to a [hostile work environment] because of discrimination based on his race?"   He responded: "Unknown, although it could be possible.  I believe the trouble he is having is because he is questioning and challenging PED [*i.e.*, Production Engineering

---

[48] According to Lawrence, there was no requirement to establish a panel of interviewers. Doc. no. 65-4 (Nov. 7, 2014 Fact-Finding Conference), at 117.

[49] Doc. no. 68 (Plaintiff's Motion to Oppose the Motion for Summary Judgment), Attachment 3, at ECF 21.

Division] Management (Mike Lawrence) on promotion decisions and the events leading up to the selection."[50]

In response to the same question, Orlando Gordon, who described his organizational relationship to plaintiff as "co-worker," stated:

> I have no knowledge regarding that.  However, I was hired into the Production Engineering Division in November 1991.  Since that time there has not been a person of color promoted to the DB4 Supervisory position within the organization.  Mr. Turnage has constantly sought opportunities for supervisory promotions and took on tasks that would make him competitive.  Unlike the individuals that were chosen by Mr. Lawrence, I believe that Mr. Lawrence's lack of support for Mr. Turnage was his way of ensuring that he would not be among the most qualified candidates.

Doc. no. 68 (Plaintiff's Motion to Oppose the Motion for Summary Judgment), Attachment 3, at ECF 25.

Those general statements do not directly relate to whether the selection process was tainted by discrimination, and, thus, do not support plaintiff's race discrimination claim.

Fourth, plaintiff did not point to any specific references in Michael Lawrence's testimony during the Fact-Finding Conference[51] that  support his claim.  Even so, after reviewing Lawrence's testimony as a whole, the court concludes that it does not

---

[50] *Id.* at ECF 22 (alteration supplied).

[51] *See* doc. no. 65-4 (Nov. 7, 2014 Fact-Finding Conference), at 82-144.

support plaintiff's claim.

Fifth and finally, plaintiff submitted the 2003 Production Engineering Division Organization Chart.[52]  The relevance of that document to plaintiff's claim is unclear, and the court concludes that it does not support his race discrimination claim.

In addition, when asked during his deposition for objective evidence indicating that he had not been selected for promotion because of his race, plaintiff was unable to provide any.  The following is a collection of responses from his deposition transcript (doc. no. 65-1):

- "Just the outbrief" (pg. 29);

- "I filed an EEO" (pg. 32);

- "there was no evidence" (pg. 32);

- "No evidence, only . . . the outbrief" (pg. 70);

- "I think the proof is in filing the EEO" (pg. 84);

- "the EEO" (pg. 106);

- "Conversations with [Lawrence] about the . . . outbrief" (pg. 106);

- "the EEO process would prove it" (pg. 150);

---

[52] Doc. no. 68 (Plaintiff's Motion to Oppose the Motion for Summary Judgment), Attachment 5, at ECF 28-29 (2003 Production Engineering Division Organization Chart).  Plaintiff's explanation for referencing that chart reads as follows:  "TAKE-AWAY: Plaintiff was the Acting Division Chief (simply not same equivalence as acting supervisor) about 2 years from being promoted to DB-IV. The selected was 5 years away from his DB-IV promotion.  Mike Lawrence was not yet in the organization.  Per Attachment 3, an organizational change came with him."  *Id.* at ECF 28.

- "the Mike Lawrence factor" (pg. 152);

- "the EEO, filing the EEO" (pg. 154);

- "[the EEO, t]hat's the only evidence I have" (pg. 154);

- "The EEO complaint" (pg. 155);

- "it's the allegations" (pg. 170); and,

- "No statements [from individuals Turnage claims have direct knowledge of the alleged discrimination], you know, none of that" (pg. 217).

None of those statements constitute objective evidence of discrimination on the basis of plaintiff's race. Instead, they are nothing more than subjective opinions. It also should be noted that plaintiff testified he had never experienced "overt" discrimination in any form during his employment with AMRDEC.[53] Plaintiff also acknowledged that the selection matrix used by Lawrence to evaluate applicants was "an objective test."[54] Even so, he contends that "the data and the use of the tool can be used to skew the data, if you will."[55] In particular, he contends, again without evidentiary support, that Lawrence "gam[ed] the system . . . to introduce unfairness to the process."[56] Plaintiff's admission that the selection matrix used for selection of the Platform Branch Supervisor was "an objective test" undermines his claim that the

---

[53] Doc. no. 65-1 (Plaintiff's Deposition), at 153.

[54] *Id.* at 61.

[55] *Id.* at 70.

[56] *Id.* at 111 (alterations supplied).

process was tainted by discrimination.  Plaintiff's subjective opinion that Lawrence "skewed" the data does not support for his opposition to summary judgment.

## VI.  CONCLUSIONS

In sum, plaintiff has failed to show that race played any part in the selection process for Platform Branch Supervisor, or in the ultimate selection of Mr. Pierce, the highest rated applicant.  Defendant's motion for summary judgment is due to be granted.  Accordingly, it is ORDERED, ADJUDGED, and DECREED that plaintiff's failure to promote claim be, and the same is hereby, dismissed with prejudice.  Costs are taxed as paid.  The Clerk is directed to close this file.

**DONE** and **ORDERED** this 1st day of April, 2022.

_____
Senior United States District Judge